IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

SHELLY DUFFEY,                        )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )          Case No. 08-1186-WEB
                                      )
BOARD OF COMMISSIONERS OF             )
BUTLER COUNTY, KANSAS;                )
SHERIFF CRAIG MURPHY, Individually    )
and official capacity, and CAPTAIN    )
GALEN WHITAKER, Individually and      )
official capacity,                    )
                                      )
                    Defendants.       )
_____      )

MEMORANDUM AND ORDER

Before the court is the defendants' Motion for Summary Judgment (Doc. 90). For the

reasons set forth, the defendant's motion is denied in part and granted in part.

I. Facts

For the purposes of the Defendant's Motion for Summary Judgment, the following facts

are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to

the plaintiff.

1. Prior to her employment with Butler County, plaintiff had been employed as a

certified nursing assistant in a nursing home.            (Def. Exh. 1, Plaintiff Depo., p. 11-14).

2. Plaintiff began her employment with Butler County, Kansas, on November 23, 2003,

as a detention officer in the Sheriff's Department assigned to work in the Butler County jail. The

title "officer" was later changed to "deputy." (Pretrial Order, Stipulation 2).

3. Plaintiff was hired by Stan Cox, the Sheriff at that time. Plaintiff interviewed with

Galen Whitaker, who was a lieutenant in the jail. (Def. Exh. 1, Plaintiff Depo., p. 100-02).

4. Cox was called to active duty in the military, and Craig Murphy became Sheriff in December 2003 or early 2004. (Def. Exh. 1, Plaintiff Depo., p. 101-02; Def. Exh. 3, Murphy Depo., p. 5).

5. In March 2005, plaintiff received a counseling statement from a supervisor, Barry Biglow, for getting into a verbal confrontation with another deputy in which the other deputy used profanity. (Def. Exh. 6).

6. On Monday, August 21, 2006, plaintiff was on day-shift assigned to the female inmate dormitory in the jail. After a fifteen minute shift meeting, plaintiff began her assignment in the dorm at approximately 6:00 a.m. (Def. Exh. 1, Plaintiff Depo., p. 32-33).

7. Three female inmates approached her shortly after she arrived and wanted to talk about Deputy Michael Schmidt. The inmates were Vanessa Gazaway, Deva Leak, and a third inmate, whose name plaintiff cannot recall. (Def. Exh. 1 Plaintiff Depo., p. 33-35).

8. The inmates told plaintiff that Schmidt has asked Gazaway for her phone number and for a date. The inmates also alleged that Schmidt touched Gazaway trying to wake her up, although they did not suggest that it was a sexual or otherwise inappropriate. (Def. Exh. 1, Plaintiff Depo., p. 61-62).

9. The inmates alleged that whenever they asked for something from Schmidt, he would ask "what are you going to do for me" or "what are you going to give me in return?" There is no evidence that he directly propositioned any of them for sex. (Def. Exh. 1, Plaintiff Depo., p. 60-61).

10. The inmates complained that Schmidt had allowed an inmate to undress and fondle

herself. Schmidt was aware of the incident and did nothing but watch. (Def. Exh. 1, p. 52).

11. Plaintiff asked the inmates to prepare written statements regarding their allegations against Schmidt. (Def. Exh. 1, Plaintiff Depo., p. 30).

12. Plaintiff prepared a written report to Lt. Aida Hiser, one of her supervisors. (Def. Exh. 1, Plaintiff Depo., p. 29-30).

13. Plaintiff placed her report and the inmates statements on Sgt. Charles Jackson's desk the same day, at approximately 11:00 a.m. (Def. Exh. 1, Plaintiff Depo., p. 49).

14. Plaintiff also spoke to Sgt. Jackson on the phone regarding the inmates' allegations. (Def. Exh. 1, Plaintiff Depo., p. 50).

15. Sgt. Jackson reviewed plaintiff's report and the written statements of the inmates, and informed Captain Whitaker of the allegations. Sgt. Jackson and Cpt. Whitaker interviewed inmate Leak regarding the allegations. (Def. Exh. 13, Jackson Depo., p. 9-11).

16. On August 22, 2006, Sheriff Murphy held an unrelated news conference with the local media to announce that an investigation was ongoing regarding allegations of sexual misconduct in the jail. Murphy was referring to an investigation into allegations of consensual sexual relations between Lt. Barry Biglow and two former female inmates which had occurred several months before. (Def. Exh. 3, Murphy Depo., p. 61-63; Def. Exh. 15).

17. As a result of the news conference, an article appeared in the August 23, 2006 edition of the August Daily Gazette. The article did not identify Biglow, the female inmates involved, or the two officers who had left employment as a result of the investigation. Those two officers were Major Dwayne Wright and Lt. Aida Hiser. Wright and Hiser were terminated for poorly supervising Biglow. (Def. Exh. 15; Def. Exh. 3, Murphy Depo., p. 61-63).

18. On August 24, 2006, the Augusta Daily Gazette published another article regarding the investigation of sexual misconduct at the jail. The article referred in general terms to the investigation of Lt. Biglow and did not reveal any names. (Def. Exh. 16).

19. On August 24, 2006, Deputy Schmidt submitted a written report to his supervisor responding to the allegations against him. (Def. Exh. 17).

20. On August 25, 2006, plaintiff worked the day shift in the female inmates' dorm after Dep. Schmidt had worked the night shit. According to plaintiff, inmates Leak and Gazaway were upset because Dep. Schmidt had been assigned to the dorm despite their complaints. (Def. Exh. 1, Plaintiff Depo., p. 114).

21. On August 25, 2006, inmate Gazaway went to the jail's visitation room to meet with her grandfather. Gazaway was upset after the visitation because of an argument with her grandfather during the visit. Gazaway advised plaintiff that Gazaway was upset because her grandfather had not brought Gazaway's children to visit her and because her grandfather said Dep. Schmidt had been calling her grandfather about bonding her out. According to Gazaway, Schmidt's calls had upset her grandfather. (Def. Exh. 1, Plaintiff Depo., p. 114-119).

22. Plaintiff was concerned that the other inmates in the dorm would become upset as a result of Gazaway being upset. Plaintiff was concerned that the other women would feed off the emotion and the tension level in the dorm would increase. Plaintiff was concerned about her own safety and the safety of her unborn child. (Def. Exh. 1, Plaintiff Depo., p. 121-29-30).

23. Plaintiff called Sgt. Jackson on the telephone and told him he needed to come to the dorm and deal with a situation. Plaintiff stated the situation concerned inmate Gazaway and that she did not want to discuss it over the phone. Sgt. Jackson asked if it was an emergency, and

plaintiff stated it was not.  Sgt. Jackson stated that he was doing paperwork, and plaintiff responded that she would deal with it herself.  (Def. Exh. 1, Plaintiff Depo., p. 121-22).

24.  Plaintiff next radioed for Cpt. Whitaker.  Cpt. Whitaker did not respond.  Sgt. Jackson heard plaintiff's radio call for Cpt. Whitaker.  (Def. Exh. 1, Plaintiff Depo., p. 122-23).

25.  When Sgt. Jackson arrived at the dorm, plaintiff told him about Gazaway being upset and about Schmidt's calls to Gazaway's grandfather.  Sgt. Jackson said he would deal with it later.  Sgt. Jackson said that he was in the middle of paperwork and that the Gazaway statement could have waited.  Sgt. Jackson said that plaintiff really needed to learn the chain of command, to which plaintiff responded, "I give a damn about the chain of command and about this place." (Def. Exh. 1, Plaintiff Depo., p. 124-25, 27-29).

26.  On August 26, 2006, plaintiff was working the day shift and at approximately 11:00 a.m. she was directed to go to Cpt. Whitaker's office.  Cpt. Whitaker had prepared disciplinary paperwork reflecting that plaintiff was to receive a three day suspension for insubordination pursuant to Sheriff Department policies 2.13(E) and 2.13(I).  (Def. Exh. 1, Plaintiff Depo., p. 132-134).

27.  The stated basis for plaintiff's suspension was the following:

On 8/25/06 it was reported that Deputy Duffey became insubordinate with her supervisor (Sgt. Jackson).  Deputy Duffey became disrespectful and used profane language towards her Supervisor.  Deputy Duffey's demeanor and attitude during the entire course of her assigned shift was insolent and rude.

(Def. Exh. 22).

28.  In Cpt. Whitaker's office, plaintiff sat down by his desk.  Sheriff Murphy was also present, although Murphy's office was not located at the jail.  According to plaintiff, Whitaker read to her from Sgt. Jackson's report regarding the day before and asked her if it was true.  She

told him it was not true because she said "damn" not "fuck." Plaintiff states that Whitaker accused her of lying and that her attitude had changed since her friends at work had been fired. (Def. Exh. 1, Plaintiff Depo., p. 133-34).

29. Plaintiff says that Whitaker thrust himself forward multiple times during the conversation, and got louder as he spoke. He did not come out of his chair or touch her. According to plaintiff, Whitaker stated he had "fired all of your buddies that's been involved in this sex scandal and you can go too." (Def. Exh. 1, Plaintiff Depo., p. 137-38, 134).

30. Whitaker stated that he planned to give her a three-day suspension, "but take your ass home, you're fired." Whitaker crossed out the suspension on the paperwork and marked termination on the form. (Def. Exh. 1, Plaintiff Depo., p. 134).

31. Plaintiff denies that she raised her voice or was disrespectful to Cpt. Whitaker during this meeting. According to plaintiff, Sheriff Murphy did not say anything until she was leaving the room when Murphy asked for her badge. Plaintiff estimates the meeting lasted approximately ten minutes. (Def. Exh. 1, Plaintiff Depo., p. 142-43, 135).

32. Sheriff Murphy observed that tension on part of both plaintiff and Cpt. Whitaker rose to a level that he felt it necessary to intervene between them. (Def. Exh. 3, Murphy Depo., p. 20-21).

33. Sheriff Murphy stated that he did not recall the specific words spoken in the meeting, but he did remember that plaintiff displayed a defiant attitude toward Whitaker during the meeting. Murphy approved Whitaker's decision to terminate her because Murphy deemed plaintiff's interaction with Whitaker to be insubordination. At the time of her termination, Sheriff Murphy was not aware of plaintiff's report of the inmate's allegations against Deputy

Schmidt.  (Def. Exh. 3, Murphy Depo., p. 20-24).

34.  The Sheriff has the final say regarding the termination of employees in his department.  (Def. Exh. 3, Murphy Depo., p. 11-12).

35.  Sheriff Murphy does not normally become involved in disciplinary matter unless it involves a termination.  (Def. Exh. 3, Murphy Depo., p. 10-12).

36.  On Monday, August 28, 2006, Deputy Schmidt received a three day suspension from Cpt. Whitaker for insubordination pursuant to Sheriff Department policy 2.13 relating to the complaints made against him by inmates Gazaway and Leak.  The state basis for Schmidt's suspension was the following:

> Facts: You were assigned to the Dormitory on 8/20/2006.  While assigned to this post you knowingly violated policy by obtaining personal phone numbers from an inmate who is incarcerated in the jail for your personal use on a later date.

(Def. Exh. 25).

37.  On Tuesday, August 29, 2006, an article appeared in the Augusta Daily Gazette indicating that Lt. Barry Biglow had been arrested the day before on felony charges of having unlawful sexual relations with two former jail inmates.  The article also indicated that Major Dwayne Wright had resigned in connection with the Biglow investigation.  The allegations against Dep. Schmidt were not mentioned in the article.   (Def. Exh. 26).

38.  The same article contained the following sentence which plaintiff believes referred to her termination:

> "In addition to Wright's resignation, [Sheriff Murphy] said, one other jail
> lieutenant has been terminated and two detention officers have also
> been terminated."

Def. Exh. 26).

39.  This newspaper article and sentence were brought to plaintiff's attention by her best friend's mother.  However, plaintiff cannot identify any persons in the community who would testify that her reputation has been damaged or diminished as a result of the article.  No one other than her best friend's mother has commented to plaintiff regarding the article.  Plaintiff has obtained subsequent employment as a certified medication assistant in a nursing home.  (Def. Exh. 1, Plaintiff Depo., p. 74, 76, 19).

40.  Sheriff Murphy denies that he was referring to plaintiff in the August 29, 2006 newspaper article as one of the two detention officers who had been terminated.  However, the only two detention officers terminated between July 1, 2006 and August 30, 2006 with the rank of Sergeant or below were plaintiff and Julie Fowler.   (Def. Exh. 3, Murphy Depo., p. 60-63).

41.  Following her discharge from employment, plaintiff did not file any kind of grievance to challenge her termination.  Nor did she request a hearing to clear her name.  (Def. Exh. 1, Plaintiff Depo., p. 146).

42.  On August 29, 2006, Barry Biglow was charged with feloniously engaging in consensual lewd fondling or touching of two female inmates between October 2005 and July 2006.  He was on administration leave until he resigned in 2007.  On August 3, 2007, Biglow pleaded guilty to one count of misdemeanor battery and all other charges were dismissed.   (Def. Exh. 28)

43.  On June 12, 2007, plaintiff filed an amended administrative complaint with the KHRC and EEOC alleging that her discipline and termination on August 26, 2006 constituted disparate treatment based on her gender.  (Def. Exh. 29).

44.  Sheriff Murphy testified in his deposition that plaintiff was part of a "clique" of

employees and staff at the jail who had poor attitudes. Plaintiff testified that she was friends with Hiser and Biglow and she got along with Wright. Hiser was hired in 2002 which was prior to Sheriff Murphy's administration; Wright and Biglow were hired in 2004 during Murphy's administration. (Def. Exh. 1, Plaintiff Depo., p. 141; Def. Exh. 3, Murphy Depo., p. 52-53).

45. Murphy and the immediately preceding Sheriff, Stan Cox, are members of the same political party. (Def. Exh. 3, Murphy Depo., p. 5-6).

## II. Jurisdiction

This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e, and 42 U.S.C. § 1983.

## III. Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Fed.R.Civ.P. 56(c)(2). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc., 259 F.3d 1226, 1231-1232 (10th Cir. 2001) quoting Adler v. Wal-Mart Stores, 144 F.3d 664, 670 (10th Cir. 1998). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670. The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgement. Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000). The burden of showing that no genuine issue of material fact exists is borne by the moving party.

E.E.O.C. v. Horizon / MS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000). Once the

moving party meets the burden, the nonmoving party must demonstrate a genuine issue for trial

on a material matter. Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1517

(10th Cir. 1994).

IV. Discussion

a. 42 U.S.C. § 1983 - Wrongful Discharge

Plaintiff argues that her Fourteenth Amendment liberty interest in her reputation was

violated because she was not given a due process hearing after her employment was terminated.

Plaintiff argues that she is entitled to a name clearing hearing following the newspaper article.

Defendants argue that Sheriff Murphy and Captain Whitaker are entitled to qualified immunity

on this charge. Plaintiff disagrees.

The Supreme Court has recognized that employees have a constitutionally protected

property interest in continued employment. Board of Regents of State Colleges v. Roth, 408

U.S. 564, 572-574, 92 S.Ct. 2701, 33 L.Ed.2d 648 (1972). Discharge from employment is

actionable under 42 U.S.C. § 1983 if an employee possesses a protectable property or liberty

interest in his employment. Hesse v. Town of Jackson, Wyo., 541 F.3d 1240, 1245 (10th Cir.

2008).

"'Where a person's good name, reputation, honor, or integrity is at stake because of what the

government is doing to him,' a protectible liberty interest may be implicated that requires

procedural due process in the form of a hearing to clear his name." Jensen v. Redevelopment

Agency of Sandy City, 998 F.2d 1550, 1558 (10th Cir. 1993)(quoting Wisconsin v.

Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). However, the plaintiff

must establish more than just damage to her reputation.  Id.  To establish a violation of liberty interests under the Due Process Clause of the Fourteenth Amendment, the plaintiff must meet the test set out in Workman v. Jordan, 23 F.3d 475 (10th Cir. 1994).  First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee; second, the statements must be false; third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and fourth, the statements must be published.  Id. at 480.  These elements are not disjunctive and must all be satisfied.  Melton v. City of Oklahoma City, 928 F.2d 920, 927 (10th Cir. 1991).

The plaintiff may satisfy the third element by showing either the statement occurred in the course of termination or other employment opportunities were foreclosed.  "The court must examine both the nature and the timing of an allegedly defamatory statement to determine whether it was made in the course of an employees termination."  Renaud v. Wyoming Dep't. of Family Servs., 203 F.3d 723, 727 (10th Cir. 2000).  In Renaud, the court determined that the defamatory statements were not made in the course of terminating the plaintiff.  The court found that the plaintiff was terminated privately.  In the case at hand, similar to Renaud, the plaintiff was terminated for insubordination, a fact that was never made public.  Since the reasons for the plaintiff's termination were not disclosed, plaintiff can only rely on the close proximity in time between her termination and the newspaper article.  However, time is not the only factor.  The newspaper article did not identify the plaintiff or the reasons for her termination.  Thus, plaintiff has not set forth sufficient evidence to show her termination and the statement published in the newspaper are related.

Furthermore, the plaintiff cannot show that the statements made by Sheriff Murphy and

published in the paper foreclosed other employment opportunities.  The plaintiff was not identified in the paper.  Any future employer reading the article would not identify plaintiff based on the newspaper article.  Obviously, termination from employment has negative consequences on an employee's search for new employment.  However, plaintiff cannot show that the statements in the newspaper, "two jail deputies were terminated," foreclosed other employment opportunities.  There is no suggestion that the statements by Sheriff Murphy and published in the paper stigmatized the plaintiff or damaged her standing in the community that foreclosed other employment opportunities.  See Stidham v. Peace Officers Standards and Training, 265 F.3d 1144, 1153-54 (10th Cir. 2001).  The record shows that the plaintiff was able to obtain other employment.

Under the first element, the plaintiff must show that her "good name, reputation, honor, or integrity" was harmed.  Plaintiff states that her best friend and her best friend's mom contacted her regarding the article.  Plaintiff has not alleged that the public as a whole would associate plaintiff based on the article.  Furthermore, plaintiff's name was not mentioned in the article.  Thus, plaintiff has not set forth any evidence that her reputation was harmed.  Without such evidence, the plaintiff cannot meet the first element of the test.

The plaintiff must also show that the statements were false.  The evidence set forth by the plaintiff does not support her claim that the statement was false.  The newspaper article stated that "two jail deputies were terminated."  Plaintiff and Julie Fowler were terminated on the same day.  Within the same time period of other terminations in the jail.  The published statements were not false.  Plaintiff tries to argue that because the article contained the words "In addition," the termination of plaintiff and Fowler were connected to the other terminations at the jail.

However, this is only plaintiff's interpretation of the article. Reviewing the evidence in the light most favorable to the plaintiff, the facts before the court show there were a number of jail employees terminated based on misconduct at the jail during this time period. Plaintiff and Fowler were terminated during this time period. Because plaintiff cannot offer evidence on the falsity of the statements, plaintiff cannot meet this element of the test.

Plaintiff did not receive a pretermination hearing. It is also clear that plaintiff did not request a posttermination hearing or take any steps to make a grievance regarding her termination. However, plaintiff has to meet the test set forth above to show that she is entitled to a name clearing hearing. If she does not meet the elements of the test (if she does not show that her liberty interests were infringed), then she is not entitled to a name clearing hearing. Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1329 (10th Cir. 2004).

Due process requires a hearing when the Fourteenth Amendment is violated. Roth, 408 U.S. at 570. However, as stated above, the plaintiff has not set forth evidence to meet the test set forth in Workman. Plaintiff has not established that her Fourteenth Amendment rights were violated and that she was entitled to a due process hearing. Because plaintiff cannot establish a violation of her liberty interests under the due process clause of the Fourteenth Amendment, the court does not address whether the individual defendants are entitled to qualified immunity. Defendant's motion for summary judgment on plaintiff's § 1983 wrongful discharge claim is granted.

b. 42 U.S.C. § 1983 - First Amendment - Right to Association

Plaintiff alleges that Sheriff Murphy and Captain Whitaker violated her First Amendment "right to association" by terminating her or approving her termination based on plaintiff's actual

13

or perceived affiliation with the prior Sheriff's administration. Sheriff Murphy and Captain Whitaker argue they are entitled to qualified immunity on this charge.

In considering whether the privilege of qualified immunity applies, the plaintiff must assert a violation of federal law, and the court must determine if the right was clearly established at the time of the defendant's unlawful conduct. "The First Amendment protects public employees from discrimination based upon their political beliefs, affiliations, or non-affiliation unless their work requires political allegiance." Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1451 (10th Cir. 1997). Plaintiff must assert that adverse employment actions were taken against her because she engaged in conduct protected by the First Amendment. Bass v. Richards, 308 F.3d 1081, 1091 (10th Cir. 2002). Plaintiff cannot merely assert that actions were taken against her in violation of protected First Amendment activity. The law is clearly established that an employer cannot take adverse action against an employee on the basis of loyalty to a political party, political affiliation, or failing to endorse or pledge allegiance to a particular political ideology. Busey v. Board of County Com'rs of County of Shawnee, Kansas, 277 F.Supp.2d 1095, 1108 (2003).

Qualified immunity provides governmental officials with the ability to reasonably anticipate when their conduct may give rise to liability, and the knowledge that they will not be held liable if their actions are reasonable in light of current law. Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The plaintiff carries the burden of showing that the law was clearly established. Greene v. Barrett, 174 F.3d 1136, 1142 (10th Cir. 1999). Plaintiff must show that at the time she was fired, the law was clearly established that an employee in her position was protected from termination based on an affiliation with the prior

Sheriff's administration.   In <u>Good v. Board of County Com'rs of County of Shawnee, Kan.</u>, 331 F.Supp.2d 1315 (D. Kan. 2004), the court found that "no reasonable government actor would know that the First Amendment right to association extends to 'perceived' association." <u>Id.</u> at 1327.  Therefore, plaintiff must base this claim on actual association, not perceived association. The Tenth Circuit has held that the job duties of a sheriff deputy do not require political loyalty, and therefore First Amendment protections apply.  <u>Dickeson v. Quarberg</u>, 844 F.2d 1435, 1444 (10th Cir. 1988).  Based on the established law at the time of her firing, if plaintiff was terminated based on her right to association, then qualified immunity does not extend to Sheriff Murphy and Captain Whitaker.

"The First Amendment protects public employees from discrimination based upon their political beliefs, affiliations, or non-affiliation unless their work requires political allegiance." <u>Mason v. Oklahoma Turnpike Auth.</u>, 115 F.3d 1442, 1451 (10th Cir. 1997).  Plaintiff must establish that political affiliation and / or beliefs were a "substantial" or "motivating" factor behind her dismissal; and that her respective employment position did not require political allegiance.  <u>Jantzen v. Hawkins</u>, 188 F.3d 1247, 1251 (10th Cir. 1999); <u>Elrod v. Burns</u>, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).  The burden of proof rests with plaintiff on the first part, and then the defendants must prove that the discharge would have occurred regardless of any discriminatory political motivation.  <u>Mason</u>, 115 F.3d at 1452.

Plaintiff has not stated what her political views were.  Furthermore, plaintiff has not set out if her affiliations or views differed from those of Sheriff Murphy.  Sheriff Murphy and the prior sheriff were members of the same political party.

There is no direct evidence that plaintiff's termination was a motivating or substantial

factor of any employment decision.  The only evidence, circumstantial at best, is the statement made by Captain Whitaker, "I have fired all your friends, I was going to suspend you, but take your ass home, you are fired."   However, the friends to which Captain Whitaker was speaking were not all associated with the prior sheriff.  One of the individuals was hired by Sheriff Cox, the other two individuals were hired by Sheriff Murphy.

Plaintiff has not cited to any evidence in the record to show a connection between the defendant's adverse employment decision and plaintiff's political loyalty, affiliation or views. Plaintiff has not cited to any facts to show a political association with the former sheriff.  Neither party has set forth any evidence that her politics, her ideology, or her political beliefs led to a dispute or problems between her and Sheriff Murphy.   Defendant's request for summary judgment on plaintiff's § 1983 right to association claim is granted.

c.  Disparate Treatment - Gender

Plaintiff asserts a Title VII and KAAD claim based on the theory that she was disciplined more severely for violating the chain of command policy and insubordination based on her gender.  Sheriff Murphy and Captain Whitaker raise the defense of qualified immunity.  Plaintiff agrees that this claim is only against Butler County, not against the individual defendants.

The defendant's brief and arguments indicate defendant believes this claim concerns only plaintiff's suspension, not her termination.  Plaintiff's brief shows that plaintiff believes her disparate treatment claim includes not only the suspension, but also the termination.  The court must determine whether this claim includes the  plaintiff's suspension only, or suspension and termination.  In making this determination, the court should consider the pretrial order, as it controls "the course of the action unless the court modifies it."  Fed.R.Civ.P. 16(d).  The pretrial

order should be construed liberally to cover all legal or factual theories embraced by its language, Koch v. Koch Indus., Inc., 203 F.3d 1202, 1220 (10th Cir. 2000), or inherent in issues defined therein, Whalley v. Sakura, 804 F.2d 580, 582-83 (10th Cir. 1986).

The pretrial order lists plaintiff's theory of recovery as, "Count III - Plaintiff was disciplined more severely than male employees who 'violated' the chain of command policy in violation of Title VII and the Kansas Act Against Discrimination." Plaintiff listed the elements of this claim as "Plaintiff must establish that: (1) Defendant discharged [or disciplined] plaintiff; (2) Plaintiff's sex and/or gender was a motivating factor in the defendant's decision; (3) Similarly situated male employees were not disciplined for their violations of the chain of command policy." The defendants listed the elements of this claim as: "Plaintiff must prove: 1) she belongs to a protected class; 2) she received discipline (three-day suspension) for the incident with Sgt. Jackson; 3) this discipline occurred under circumstances which give rise to an inference of unlawful gender discrimination; 4) defendant's explanation for the discipline was a pretext to conceal intentional discrimination; and 5) plaintiff sustained compensable damages resulting from her discipline." A review of the plaintiff's brief shows plaintiff argues that "[S]he suffered the adverse employment action of first being (or at least she was going to be) suspended and she was terminated for her actions in the meeting with Cpt. Whitaker."

Plaintiff claims she was disciplined more severely than male employees. Obviously, discipline includes termination, as well as suspension. Plaintiff's claim is for disparate treatment based on discipline, which included suspension or termination.

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (1) that she belongs to a protected class; (2) that she suffered from an adverse employment action;

and (3) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  Hysten v. Burlington N. & Santa Fe Ry., 296 F.3d 1177, 1188 (10th Cir. 2002).  The third part of the test may be satisfied by proof that the employer treated similarly situated employees more favorably.  Id. at 1181.  "The framework is flexible and ... a comparison to similarly situated co-workers need not be made in every case."  Baker v. Blue-Cross Blue Shield of Kan., Inc., 128 Fed.Appx. 701, 703 (10th Cir. 2005) (unpublished opinion) (citing E.E.O.C. v. Horizon / CMS Healthcare Corp., 220 F.3d 1184, 1195 & n. 6 & 7 (10th Cir. 2000)).  To be similarly situated, employees ordinarily must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline."  McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006), citing Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997).   Adverse employment action includes "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007).

If the plaintiff is able to establish a prima facie case of discrimination, the burden shifts to the defendant to demonstrate a legitimate non-discriminatory reason for the adverse employment action.  Swackhammer v. Sprint/United Management Co., 493 F.3d 1160, 1167 (10th Cir. 2007).  Then the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual.  Id.  A plaintiff can satisfy this burden by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted

non-discriminatory reasons." <u>Argo v. Blue Cross and Blue Shield of Kansas, Inc.</u>, 452 F.3d 1193, 1203 (10th Cir. 2006).  A plaintiff may also prove pretext by providing evidence that the stated reason for the employment action was false, or by showing that the employer treated the plaintiff differently from other similarly situated employees.  <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000).   A plaintiff may also show pretext by producing evidence that defendant acted contrary to written company policy prescribing the action to be taken under the circumstances, or by producing evidence that defendant acted contrary to unwritten policy or company practice when making the adverse employment decision.  <u>Id.</u>

A "mere inconvenience or alteration of job responsibilities" does not rise to the level of an adverse employment action.  <u>Dick v. Phone Directories Co., Inc.</u>, 397 F.3d 1256, 1268 (10th Cir. 2005).  Whether a particular action is adverse depends upon the circumstances of the particular case, and should be considered from the perspective of a reasonable person in the plaintiff's position.  <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 71, 126 S.Ct. 2405 (2006).  In <u>Burlington</u>, the court reviewed a 37 day suspension, without pay, and found that many reasonable employees would find that a month without a paycheck to be a serious hardship.  <u>Id.</u> at 72.  The Court found that a 37 day suspension could act as a deterrent to filing a charge of discrimination.  <u>Id.</u> at 73.

In the case at hand, a three day suspension, without pay, would be an adverse employment action.  If imposed, the plaintiff would experienced a loss of material benefit in that her pay would have been effected.  To meet the prima facie case of discrimination, the plaintiff must also show that adverse employment action occurred under circumstances that give rise to an inference of discrimination.  Plaintiff relies on the same facts to support her prima facie case

for disparate treatment based on the suspension and termination - that she was treated differently than similarly situated employees.

In support of her argument, plaintiff provides documentation regarding the discipline of other employees. The employees were all deputies, and were all under the same supervisor and subject to the same standards as plaintiff, both as a Butler County employee and a jail deputy. On January 24, 2009, Deputy James Johnson was disciplined on two charges of insubordination. Deputy Johnson received a written reprimand. (Pl. Exh. C).

On March 21, 2004, Officer Collister received a verbal reprimand for making unprofessional and derogatory statements toward another officer about her child, following "numerous write ups over Ofc. Collister's attitude." (Pl. Exh. D). Prior to the March 21, 2004 incident, Officer Collister was counseled on insubordination and disrespect on March 11, 2004. No discipline action was taken. Also on March 11, 2004, Officer Collister was counseled on a separate incident of insubordination and disrespect. No discipline action was taken. On September 3, 2004, Officer Collister was counseled for disrespect and unprofessional conduct toward an inmate. No other action was taken. On September 8, 2004, Officer Collister was suspended for five days based on employee conduct. (Pl. Exh. D). The Consultation Report states, "In the past twelve months Ofc. Collister has been counseled nineteen times regarding his conduct and has received at least two letters of reprimand. Ofc. Collister has shown a complete lack of regard for Butler County Policy and Butler County Jail Policy and Procedure." (Pl. Exh. D).

On August 25, 2006, Deputy Schmidt received a three day suspension for insubordination, based on violating policy by obtaining personal phone numbers from an inmate

while at work.  (Pl. Exh. H).  On February 3, 2007, Deputy Schmidt was counseled for

introducing contraband into the jail.  No further action was taken.  On April 15, 2007, Deputy

Schmidt was suspended for three days.  (Pl. Exh. J).  The Consultation Report states that "he

continues to violate policies," including using department property for personal use, loss of

department name tag, and being sent home for unpresentable uniform.  The Report continues,

"Supervision continue to address issues regarding his job performance, reporting late to work,

taking extended lunch breaks, cleanliness of his area and general expectation of what's expected

of him."  Finally, on August 18, 2007, Deputy Schmidt was counseled on misconduct because he

"forgot" to check on an inmate on three different occasions, after being advised that he was sick.

When another deputy checked on the inmate, he was taken to the hospital for treatment.  The

report also states that there were discrepancies in his report regarding the incident.  No other

action was taken.

The examples set forth above show that plaintiff was treated differently than other

deputies at the jail both in the suspension and the termination.  Most striking is Officer Collister,

who was counseled for disrespect with no other action, and only given a verbal reprimand for

insubordination.  Even after being counseled 19 times, he was given a 5 day suspension.  It is

also striking that Dep. Schmidt was only counseled after abandoning his job duties, which placed

an inmate's health at risk.  Plaintiff was counseled on March 28, 2005 for conduct unbecoming a

department member, based on a verbal confrontation with another officer.  (Def. Exh. 6).  She

did not receive any other discipline action until August 25, 2006, the date she was terminated.

The plaintiff has set forth evidence in which a jury could find that preferential treatment was

given to employees outside the protected class.   See <u>Plotke</u>, 405 F.3d at 1101  (quoting

Chertkova v. Connecticut Gen. Life Ins., 92 F.3d 81, 91 (2nd Cir. 1996) (one manner in which a plaintiff may show an inference of discrimination is in preferential treatment given to employees outside the protected class). A jury could find that plaintiff was treated differently than similarly situated employees. The plaintiff has met her burden.

Having made out a prima facie case of disparate treatment, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for discipline. Defendants assert that plaintiff was first going to be suspended, but was then terminated, for insubordination. The defendant has met the burden.

The burden shifts back to plaintiff to put forth evidence to establish that the proffered explanation is a pretext to conceal intentional discrimination. There are two typical methods to show pretext. First, by direct evidence that the stated reason for the adverse employment action is false; or by evidence that the employer treated the plaintiff differently from other similarly situated employees who violated work rules of comparable seriousness. Swackhammer, 493 F.3d at 1167. Disparate treatment of similar employees is "especially relevant" in the pretext inquiry. Trujillo v. PacifiCorp, 524 F.3d 1149, 1158 (10th Cir. 2008).

Plaintiff points to evidence that she was treated differently than other employees, as set out in the prima facie case. Those other employees were subject to drastically different discipline for actions that were similar to plaintiff's actions. Plaintiff had only one other Consultation Report in her file, which occurred 17 months prior to her termination, compared to the employees with numerous write-ups, reprimands, and counseling. Additional evidence supports plaintiff's claim that she was treated differently than other employees. Sheriff Murphy stated that he did not get involved in the day to day operations at the jail, including the felony

criminal charge investigation against a jail deputy, however, he was present for plaintiff's termination to be a witness for Captain Whitaker.   Sheriff Murphy states that in the meeting with him and Captain Whitaker, plaintiff was challenging Captain Whitaker in a heated discussion, and that the situation was not beneficial for the detention center.  However, he is unable to remember anything that was said, and bases this statement only on plaintiff's "defiant attitude."

Sheriff Murphy also states that:

"Duffey was in that clique that I was having trouble.  With all this other stuff we have talked about, the people we have talked about in here today, Duffey was a part of the clique.  I had a clique that was - I had supervisors who were not supervising, I had detention officers that, honest to Pete, were more engrossed in fellow detention officers  - and I am going to say male officers, female officers.... And this was the thing I had to get under control.....If Duffey had not displayed the attitude she did that Saturday morning, she would have probably got a suspension and, speculating, could have kept her out of trouble, could probably have still been out there today.  But that display of attitude fit right in with all the rest of that crowd who has since gone... But I also know if you walk like a duck, quack like a duck, you're probably a duck; and I had a whole lot of ducks out there.  I had good people but then I had this clique and they all stuck together." (Def. Ex. 3, p. 52-53, 56-57.).

However, Sergeant Jackson testified that he had worked with plaintiff from the time she started, and never experienced any problems with her, or experienced a bad temper.  (Def. Exh. 13, p. 22).

A jury could find that plaintiff presented direct evidence that the stated reason for the adverse employment action was false.   At the meeting in which plaintiff was fired, plaintiff testified that Captain Whitaker stated that "I have fired all your friends, I was going to suspend you, but take your ass home, you are fired."

Finally, there is controverted evidence in the record regarding the reasons for plaintiff's

termination. The paperwork states that plaintiff was dismissed for insubordination toward Sgt. Jackson. However, Sheriff Murphy stated that plaintiff was terminated based on her defiant attitude. That information is not reflected in the plaintiff's file.

There is controverted evidence in the record regarding the reasons for plaintiff's termination, and whether the stated reason was pretext. There is evidence in the record from which a jury could find the stated reason contains inconsistencies or contradictions in the employer's proffered legitimate reasons. As set out above, the plaintiff's discipline was drastically different than other male deputies. The Consultation Report states that plaintiff was terminated for insubordination, even though other deputies with similar violations were not terminated, although they had more reprimands, suspensions, or consultations. Further, Sheriff Murphy states that plaintiff was terminated based on her attitude in the meeting with Captain Whitaker, however, the documentation does not support that explanation. The documentation only states that plaintiff was terminated for insubordination. Plaintiff has set forth evidence to cast doubt on the employer's reasons for termination. Summary judgment on this claim is denied.

e. Whistle blowing

Plaintiff asserts a state-law whistle blowing claim based on the theory that she was terminated in violation of Kansas public policy for reporting Deputy Schmidt's conduct. Defendants argue that this tort is only applicable to employers and not to individual supervisors. In Ortega v. IBP, Inc., 255 Kan. 513 (1994), the Kansas Supreme Court found that whistleblower actions were similar to workers compensation retaliatory discharge actions, as "both are tort actions for the same type of conduct of the employer: firing an employee in retaliation for

something the employee has done...Both exceptions ...developed to control the actions of the employers which violate public policy...The basis of both... is the employer's bad motive in discharging the employee." Id. at 521, overruled on other grounds in In re B.D.-Y, 286 Kan. 686 (2008). The whistleblower tort action is only against Butler County.

The leading Kansas case on whistle-blowing is Palmer v. Brown, 242 Kan. 893, 752 P.2d 685 (1988).

> "Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort. To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employees's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." Id. at 900.

After the employee establishes a prima facie case for whistleblowing, as set forth in Palmer, the employer must produce evidence that the employee was terminated for a legitimate nondiscriminatory reason. Goodman v. Wesley Medical Center, L.L.C., 276 Kan. 586, 589-90 (2003). The employee must then show the employer's motives were pretextual. Id.

In Herman v. Western Financial Corp., 254 Kan. 870 (1994), the court found that violations of internal policies and guidelines were not sufficient to meet the requirement of Palmer. Id. at 881. The court emphasized that the reported activity must violate a rule,

regulation, or the law pertaining to public health, safety, and the general welfare.  <u>Id.</u>  at 882.

The plaintiff in <u>Herman</u> and the plaintiff in the case at hand rely on <u>Pilcher v. Board of</u>

<u>Wyandotte County Comm'rs</u>, 14 Kan.App.2d 206, 787 P.2d 1204, *rev. denied* 246 Kan. 768

(1990).  In <u>Pilcher</u>, the plaintiff maintained that she was terminated from her employment

because her employer believed she was the source of an article published in the Kansas City

Times which was critical of the hiring practices engaged in by the county.  The court found that

> "If the matters reported in the Kansas City Times were true, and there is evidence
> that they were, the county was engaging in very questionable hiring practices
> which ultimately would have a detrimental effect on the general welfare of the
> taxpayers of Wyandotte County.  If we were to permit Pilcher to be discharged
> because the Board believed she was the source of the newspaper article, we would
> be cutting off a very important source of public information concerning the
> operation of local and state governments.  Therefore, even though the action of
> the Board in hiring Wallace may not have been in violation of the law, it
> was certainly sufficiently harmful to the public interest to qualify it as the basis for a
> claim of retaliatory discharge for 'whistle-blowing.'" <u>Id.</u> at 213.

In <u>Herman</u>, the court differentiated between "public policy" of prohibiting terminations due to

whistle-blowing, with failure to meet guidelines set out by the company.  254 Kan. at 882.  The

court  found that unless the conduct was illegal, there was no claim for whistleblowing.  <u>Id.</u>

In <u>Larson v. Ruskowitz</u>, 252 Kan. 963, 850 P.2d 253, the court found that the plaintiff did

not make a claim that the employer was in violation of any rules, regulations, or the law

pertaining to public health, safety, and the general welfare.  <u>Id.</u> at 974.  Instead, plaintiff raised

claims based on his First Amendment right to free speech.  <u>Id.</u>   Therefore, the claim was

wrongfully decided under a whistle-blowing analysis.  The distinction between retaliatory

discharge due to whistle-blowing and retaliatory discharge based on a First Amendment right to

freedom of speech "appears to be based upon the content, form and context of the employee's

statements: a whistle-blower reports an employer's wrongdoing; an employee exercising his or

her First Amendment rights speaks out on issues of public concern." <u>Dennis v. Ruskowitz</u>, 19 Kan.App.2d 515, 522, 873 P.2d 199 (1994). In this case, the Kansas Court of Appeals again stated that <u>Pilcher</u> was not based upon whistle-blowing, but rather upon the exercise of the plaintiff's First Amendment rights. <u>Id.</u> at 524-25.

Plaintiff's reliance on <u>Pilcher</u> is misplaced. As other courts have found, <u>Pilcher</u> should have been analyzed under a First Amendment right to freedom of speech analysis. In the case at hand, plaintiff does not argue that Butler County was in violation of any rules, regulations, or the law. Plaintiff complained to her supervisors that Deputy Schmidt was acting inappropriately, he requested an inmate's phone number, and he touched an inmate to wake her up. The complaints against Schmidt were that he violated workplace guidelines, not that he violated a rule or law pertaining to public health and safety.

Plaintiff requests that the court set a new precedent, and find that "it should be the public policy of Kansas that a jail is not going to be used for the pleasure of guards by watching women fondle themselves or as a source of social contact for future dates when the inmate is released." However, plaintiff's argument is contrary to case law. Reported violations of internal policies are insufficient to establish a claim for whistleblowing. The reported conduct must violate the law. There is no evidence before the court that the actions of Deputy Schmidt were in violation of the law. Plaintiff argues that Deputy Schmidt may have violated the stalking statute, K.S.A. 21-3438. However, plaintiff does not set forth any evidence to show how the conduct of Deputy Schmidt could meet the elements of the offense.

Plaintiff has not set forth sufficient evidence that she reported conduct that was in violation of the law. Therefore, she cannot establish the first element of the whistleblower test,

as set out in Palmer.  The defendant's request for summary judgment on this issue is granted.

V.  Conclusion

IT IS THEREFORE ORDERED  defendants' Motion for Summary Judgment (Doc. 90) is denied in part and granted in part.  Summary judgment is granted on plaintiff's 42 U.S.C. § 1983 - Wrongful Discharge claim, 42 U.S.C. § 1983 First Amendment right to association claim, and whistleblowing.  Summary judgment is denied on plaintiff's gender discrimination claim based on disparate treatment.

IT IS SO ORDERED this 25th day of March, 2011.


    s/ Wesley E. Brown
Wesley E. Brown
Senior United States District Court Judge